Thomas R. WETHERALD,
Appellant–Plaintiff,

v.

Ronald E. JACKSON and, Eileen E.
Jackson, Appellees–Defendants.

No. 03A01–0511–CV–518.

Court of Appeals of Indiana.

Oct. 23, 2006.

Jeffrey L. Beck, Beck Harrison, P.C., Columbus, Indiana, Attorney for Appellant.

Joyce Thayer–Sword, Columbus, Indiana, Attorney for Appellees.

## OPINION

MATHIAS, Judge.

Thomas Wetherald ("Wetherald") and Ronald and Eileen Jackson ("the Jacksons") are owners of adjoining lots on Grandview Lake. After a property dispute arose between the parties, Wetherald filed a complaint to quiet title in Bartholomew Circuit Court. The Jacksons then filed a counterclaim for declaratory judgment of adverse possession. After a hearing, the trial court issued findings of fact and conclusions of law, and found that the Jacksons had established the elements of adverse possession by clear and convincing evidence. Wetherald appeals and raises three issues, which we restate as:

 I. Whether fourteen of the trial court's twenty findings of fact are supported by the evidence and whether two conclusions of law are clearly erroneous;

 II. Whether the Jacksons established the elements of adverse possession by clear and convincing evidence; and,

 III. Whether the Jacksons established that they reasonably believed in good faith that they paid the taxes on the disputed real estate.

Concluding that Wetherald has failed to establish any reversible error concerning his challenge to the trial court's findings of fact and conclusions of law and that the Jacksons established the elements of adverse possession by clear and convincing evidence, we affirm.

### Facts and Procedural History

In 1988, the Jacksons purchased Lot 67A on Grandview Lake in Bartholomew County, Indiana.[1] At the time of pur-

chase, James and Rosalyn Strahl owned the adjoining lot, Lot 66. The Jacksons have not built a residence on the lot and use the lot and waterfront for recreational purposes only. The Jacksons use their lot approximately once a week during the summer months, generally on Sundays.

At the time of purchase, the lot had a boat dock. There was also a sandy beach area which the Jacksons believed was situated on their lot. On the side of the beach area nearest to Lot 66, a wooden board jutted out into the water. James Strahl told the Jacksons that the board was the boundary line between the two properties. Ex. Vol., Plaintiff's Ex. 3, pp. 8–9.

In 1995, Wetherald purchased Lot 66 from the Strahls. After Wetherald purchased Lot 66, the Jacksons continued to use the waterfront area that they believed to be theirs based on the representation made by Strahl (hereinafter known as the "transfer area").[2] Wetherald never objected to the Jacksons' use of the transfer area.

Prior to Wetherald's purchase of Lot 66, the Jacksons made several improvements to Lot 67A. They replaced the dock and built a deck and gazebo. Portions of the Jacksons' dock and beach area are situated within the transfer area. A small section of a corner of the Jacksons' deck also juts out into the transfer area. After Wetherald's purchase of Lot 66, the Jacksons added another section of dock and installed a boat lift in the transfer area. They also built a retaining wall and continued to maintain the sandy beach area.

In 2004, Wetherald installed a jet ski dock near the Jacksons' beach area. The Jacksons believed that the jet ski dock was on their property, and therefore requested

---

1. In 1991, the lot was replatted and the lot number was changed from 67 to 67A.

2. A copy of a survey of the transfer area is attached as an appendix to this opinion.

that Wetherald move it. Wetherald refused. On August 23, 2004, Wetherald filed a complaint to quiet title alleging that the Jacksons had no legitimate claim to the transfer area and that they were "unlawfully interfering with [Wetherald's] fee ownership and possession of his property." Appellant's App. p. 432. In response, the Jacksons filed a counterclaim for declaratory judgment of adverse possession.

A hearing was held on August 31, 2005. At the hearing, Wetherald testified that he knew that the Jacksons were using his property but never prevented them from doing so because he was trying to be a "good neighbor." Tr. p. 59. All parties conceded that the water of the transfer area was used by Wetherald and the Jacksons for swimming and boating.

On November 7, 2005, the trial court entered the following findings of fact:

1. Per stipulation of counsel, Plaintiff Thomas R. Wetherald is the record owner of Lot 66 in the Third Addition to the Town of Grandview Lake as recorded in Plat Book "D", pages 184–185 in the Office of the Recorder of Bartholomew County, Indiana. He became the owner in August, 1995 by purchase from James H. Strahl and Rosalyn M. Strahl.

2. Per stipulation of counsel, Defendants, Ronald E. Jackson and Eileen E. Jackson are the record owners of Lot 67A in the Third Addition to the Town of Grandview Lake, replat of lots 67 & 68 as recorded Plat Book "P", page 172A in the Office of the Recorder of Bartholomew County, Indiana. They became the owners in August, 1988.

3. The property owned by Wetherald lies adjacent to and abuts the Jacksons' property on Wetherald's north boundary and Jacksons' south boundary. Aerial or overhead depictions of the Wetherald's and Jacksons' property are found in Jacksons' Exhibits B & F.

4. The common boundary line between Wetherald's and Jacksons' property includes some waterfront area. The depiction of the waterfront area of Wetherald's and Jacksons' property is found in Jacksons' Exhibit B and page 1 of Wetherald's Exhibit 1.

5. The area in dispute is referred to as the "transfer area" in Jacksons' Exhibit B and consists of 0.0734 acres of land. Some of the transfer area is at water's edge over dry land and some of it is under the water of Grandview Lake. The parties stipulated that Wetherald is the record owner of the disputed transfer area. The dispute in this case arose in 2004 when Wetherald constructed a portable jet ski dock in the corner of transfer area near the wooden board which had jutted into the water. The Jacksons' believed the land to the east of the wooden board belonged to them. Wetherald constructed the jet ski dock in the water just to the east of ... where the wooden board entered the water.

6. Certain improvements made by Jacksons since 1988 are in the disputed transfer area. The improvements made by Jacksons in the transfer area are sand beach, retaining block wall with steps, corner of wood deck, jet ski dock and boat dock. All of these improvements are on shore or in the water and are evident in pictures entered as Jacksons' Exhibits A(5), A(7), A(8), A(9), A(10) and A(11) and also Wetherald's Exhibit 6. The sand beach, corner of wood deck and boat dock have been in place for more than ten years prior to the filing of this law suit. The retaining block wall and jet ski dock have been in place less than 10 years.

7. At the time Jacksons purchased their lot in 1988, lot 66 (which is now owned by Wetherald) was owned by

James H. Strahl and Rosalyn M. Strahl. Jacksons were told and believed that the boundary between their lot and Strahls' lot, at the water's edge, ran from a board jutting out in the water which was connected to the east end of a wooden retaining wall. From the edge of the wooden board, they believed that their land then ran southeast past the wood deck and boat dock, thence north to a hedge line on the shore. The transfer area is part of what Jacksons believed they purchased in 1988.

8. The board jutting out into the water and the wooden retaining wall were clearly evident in pictures entered as Jacksons' Exhibit A(2), A(4), A(5) and H which were taken from 1988 through 1996. The wooden retaining wall is still in place today and is clearly evident in Wetherald's Exhibit 6 and Defendant's Exhibit A(8), A(9), A(11), and A(12). The board jutting out into the water was removed by Wetherald at or near the time of building his jet ski lift.

9. After the Jacksons' purchase of their lot, then owners of lot 66, Strahl constructed a walkway bridge from a south area of lot 66 over the water to the beach area lying west of the board jutting out into the water and south of the wooden retaining wall. This area is like a giant sand box with a wooden retaining wall to the north and wooden board jutting out into the water to the east. This bridge and beach area are clearly evident in Jacksons' Exhibit A(4) and was in place at the time Wetherald purchased his lot from Strahl's [sic]. This piece of evidence is particularly telling. Strahl build [sic] the bridge to the sand box area west of the transfer area and did not interfere with Jacksons' use of the beach Jacksons constructed east of the wooden board.

10. At all times from 1988 until Strahl's sale of lot 66 to Wetherald in 1995, the area used by Jacksons at the water's edge and into the water included the transfer area shown on Defendant's Exhibit B. Strahl's [sic] did not maintain or exercise any control over the transfer area from 1988 through date of deed to Wetherald in 1995.

11. Jacksons do not reside on their lot. Use of their lot and the transfer area was approximately once a week for the summer months from Memorial Day up to and including September of each year. Jacksons would come during the week only intermittently and during the winter on rare occasions.

12. After Wetherald's purchase of lot 66 from Strahl's [sic] in 1995, Wetherald and Jacksons continued the use of the water and water's edge in the same manner as when Strahl's [sic] had been [the] owner. Wetherald used the water's edge up to the board jutting into the water attached to the retaining wall. The Jacksons continued to use the transfer area to the east of the wooden board.

13. After Wetherald's purchase of lot 66 from Strahl's [sic] in 1995, Wetherald did not attempt to exercise any control over the transfer area used and improved by Jacksons' [sic]. Wetherald had notice when the block retaining wall was being built by Jacksons, but he did not object to the construction or offer to pay for the construction. The block retaining wall is located in the transfer area. He also had notice of the jet ski dock being build [sic] as well as the placement of the boat lift in the transfer area water.

14. Wetherald told guests at his lot that when Jacksons were not present the guests could fish the shore-line as far as the (western) corner of the wood deck but no further to the east because

past that point belonged to Jacksons. The wooden deck is west of the wooden dock and both of them are in the transfer area. Wetherald testified at trial that he told guests that they could fish to the end of Jacksons' wood dock, not deck. However, Wetherald's guests who testified at trial refuted Wetherald's assertion. The testimony from the guests show that Wetherald had notice of Jacksons' claim to the land in the transfer area.

15. Wetherald has made many improvements to other parts of lot 66 including constructing of a beach area used by his guests on the south water edge of lot 66 west from the transfer area. However, Wetherald had made no improvements to the transfer area since 1995 until construction of the portable ski jet dock in 2004.

16. Jacksons paid all taxes and assessments on lot 67A and reasonably believed, in good faith, that payment of all taxes on 67A included the transfer area and improvements in the transfer area. The taxes which they paid did include taxes paid on the wooden deck partially in the transfer area.

17. Since Jacksons' purchase of their lot in 1988 they have believed that the deed for their lot contained the transfer area. They exercised control over the transfer area intending to show their ownership by construction of improvements and use of the transfer area in such a nature to be open to the world.

18. At the time of Jacksons' purchase of Lot 67A in 1988, a wooden dock was present in the east end of the transfer area. This was represented to the Jacksons to be contained within Lot 67A. Jacksons have rebuilt the wooden dock in its original location. It is customary for a property owner on a lake to have a dock on the water for their boat. Jacksons' use of the dock was exclusive to all others.

19. Shortly after the purchase of Lot 67A in 1988, the Jacksons placed sand on the beach east of the wooden board which jutted into the water. The Jacksons have continuously maintained the land area east of the wooden board. Wetherald did not maintain the land east of the wooden board. Acts which demonstrate their control over this land include building a wooden deck in the area as well as building a block retaining wall with steps. Acts which demonstrate their control over the transfer area in the water include using the boat dock as it existed in 1988, rebuilding it, building a jet ski dock, and placing a boat lift next to the wooden dock.

[20]. The Jacksons' use of the transfer area has continued without permission from Wetherald or his predecessor in interest and without interruption since 1988.

Appellant's App. pp. 5–10.

The trial court concluded that the Jacksons established by clear and convincing evidence that they adversely possessed the transfer area, and the Jacksons reasonably believed in good faith that payment of taxes on Lot 67A included the transfer area. Therefore, the court concluded that the Jacksons substantially complied with the tax statute requirement for adverse possession. Accordingly, the court denied Wetherald's claim to quiet title and granted the Jacksons' claim for declaratory judgment of adverse possession. Wetherald now appeals.[3] Additional facts will be provided as necessary.

---

**3.** We granted Wetherald's motion for oral argument in this case; however, the oral argument was canceled pursuant to Wetherald's

## Standard of Review

Pursuant to Indiana Trial Rule 52(A) (2006), our court will not set aside the trial court's findings or judgment "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A judgment is clearly erroneous when there is "no evidence supporting the findings or the findings fail to support the judgment and when the trial court applies the wrong legal standard to properly found facts." *Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind.2005) (citations omitted). "While findings of fact are reviewed under the clearly erroneous standard, appellate courts do not defer to conclusions of law, which are reviewed de novo." *Id.* However, when we are faced with mixed issues of fact and law, we apply an abuse of discretion standard. *Id.* "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made." *Id.*

## I. Findings of Fact

Wetherald challenges several findings of fact arguing that the findings are not supported by the evidence. In addition, Wetherald contends that the trial court's "near verbatim adoption of [the] Jacksons' proposed findings requires careful scrutiny." Br. of Appellant at 13.[4] However, while the trial court's findings are similar to the Jacksons' proposed findings, we also note differences between the two sets of findings which lead us to conclude that the trial court carefully considered the testimony and evidence presented before issuing its findings of fact and conclusions of law.

A. *Finding Number 5 ("The portable jet ski dock")*

■ In finding number 5, the trial court made the following statement, which Wetherald claims is not supported by the evidence: "The dispute in the case arose in 2004 when Wetherald constructed a portable jet ski dock in the corner of transfer area near the wooden board which had jutted into the water." Appellant's App. p. 6. Wetherald asserts that there is no evidence that the jet ski dock was portable "or in some way anything less than a permanent structure." Br. of Appellant at 14.

Surveyor Ted Darnall and Eileen Jackson both stated that the jet ski dock was plastic. Tr. pp. 87, 140. However, Darnall also stated that he could not tell if the plastic jet ski dock was permanent or temporary. Tr. p. 89. Wetherald's friend, Thomas Carmer gave the following testimony concerning the jet ski dock: "We took off a section of boat dock and then we just took it off and moved it and tied it on to the end." Tr. p. 187. In addition, the

---

motion. Moreover, we denied Wetherald's motion to continue the oral argument.

4. Concerning the verbatim adoption of findings, our court has observed:

[T]he practice of accepting verbatim a party's proposed findings of fact "weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." However, . . . verbatim reproductions of a party's submissions are not uncommon, as "[t]he trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning." The need to keep the docket moving is properly a high priority for our trial bench. For this reason, the practice of adopting a party's proposed findings is not prohibited.

*In re the Marriage of Nickels*, 834 N.E.2d 1091, 1095–96 (Ind.Ct.App.2005) (internal citations omitted).

trial judge personally viewed the jet ski dock. Therefore, there is some evidence to support the trial court's finding that the jet ski dock was portable. In addition, whether the jet ski dock was portable or permanent is not outcome determinative in this case.

### B. *Finding Number 7 (The Jacksons' belief that they owned the transfer area)*

■ In Finding Number 7, the trial court states, in pertinent part: "Jacksons were told and believed that the boundary between their lot and Strahls' lot, at the water's edge, ran from a board jutting out in the water which was connected to the east end of a wooden retaining wall. From the edge of the wooden board, they believed that their land then ran southeast past the wood deck and boat dock, thence north to a hedge line on the shore. The transfer area is part of what Jacksons believed they purchased in 1988." Appellant's App. p. 7.

Wetherald argues that the evidence does not support this finding because the Jacksons could not give a consistent description of the transfer area, which they thought they owned. The Jacksons testified that they believed that the wooden board jutting out into the water marked the boundary between their lot and Wetherald's. However, as Wetherald notes, the Jacksons' testimony was not as consistent with regard to the water and the land under the water, which is situated in the transfer area.

Ronald Jackson gave the following testimony with regard to the water located in the transfer area:

[I]t was always our belief that the water was usable by everyone ... we thought it would be impossible though for a neighbor to build a dock across the front of that property line. We would have assumed that that was, that's our water[.]

Tr. p. 199. Jackson was also asked whether he exerted any control over the water in the transfer area and he responded, "if someone were to try to build in that transfer area I would have exerted control but there's no need.... [W]hat kind of control would I exert? I can stop somebody from running a boat up in that area I would never do that." Tr. p. 203. Jackson also stated that he never told anyone that they could not swim in the area. Tr. p. 204. Jackson testified that he did not do anything to give Wetherald notice prior to 2004 that he was claiming ownership of the entire transfer area and that he never thought there was a need to do anything to indicate his intent to own the entire area. Tr. p. 204. Finally, Jackson testified that if the water receded he would own the land exposed by the receding water. Tr. pp. 207–08.

From Jackson's testimony, it is reasonable to infer that Jackson believed he owned the land under the water in the transfer area. Moreover, Jackson's testimony reveals that although he believed that anyone could swim and boat in the water of the transfer area, he was in control of and owned the transfer area. Therefore, we conclude that the trial court's finding is supported by the evidence.[5]

### C. *Finding Number 8 (Removal of the board)*

■ In finding number 8, the trial court states, "[t]he board jutting out into the

---

5. Wetherald also argues that the Jacksons could not have reasonably believed that they owned the transfer area because they received a survey of their lot in 1988 and a replat of their lot in 1991. We are unpersuaded by Wetherald's argument and will specifically address this precise argument in our discussion of his challenge to finding number 16.

water was removed by Wetherald at or near the time of building his Jet Ski lift." Appellant's App. p. 7. Wetherald's jet ski dock was built in 2003 or 2004. However, the board was removed approximately three to four years before the jet ski dock was built. Tr. p. 48. Although the trial court's finding that the board was removed "at or near the time" the jet ski dock was built is not supported by the evidence, this finding is not dispositive of the outcome in this case.

### D. Finding Number 9 (Strahl's construction of the walkway bridge)

■ In finding number 9, the trial court stated, "After the Jacksons' purchase of their lot, then owners of lot 66, Strahl constructed a walkway bridge from a south area of lot 66 over the water to the beach area lying west of the board jutting out into the water and south of the wooden retaining wall.... This piece of evidence is particularly telling. Strahl build [sic] the bridge to the sand box area west of the transfer area and did not interfere with Jacksons' use of the beach Jacksons constructed east of the wooden board." Appellant's App. pp. 7–8.

Wetherald contends that as there was no testimony concerning Strahl's intent in constructing the bridge, "[t]o draw an inference that is 'particularly telling' from evidence that was never presented is troubling in light of the clear and convincing standard. Apparently, the trial court believes that because Strahl did not construct the walkway bridge the entire length of his property line he must have thought he did not own it." Br. of Appellant at 17. In response, the Jacksons note that their son David testified that Strahl built the bridge after the Jacksons purchased their lot in 1988, Strahl was "very concerned about trying to stay off" the Jacksons' property, and Strahl did not use

the area west of the wooden board. Tr. pp. 81–83. This testimony supports the trial court's finding.

### E. Finding Number 10 (Strahl did not exercise any control over the transfer area)

■ In finding number 10, the trial court states, "[a]t all times from 1988 until Strahl's sale of lot 66 to Wetherald in 1995, the area used by Jacksons at the water's edge and into the water included the transfer area shown on Defendant's Exhibit B. Strahl's [sic] did not maintain or exercise any control over the transfer area from 1988 through date of deed to Wetherald in 1995." Appellant's App. p. 8. Wetherald asserts that the Jacksons were never able to accurately identify the boundaries of the transfer area, and therefore, "they cannot claim that Strahl did nothing to maintain the area." Br. of Appellant at 17. Moreover, Wetherald claims the trial court improperly shifted the burden of proof onto him because, as the title holder, Strahl did not have to exert control over the transfer area.

The Jacksons continually testified that they used and maintained the transfer area by using the sandy beach on a regular basis, swimming and boating in the area, and building improvements in the transfer area. Moreover, they testified that Strahl never used the transfer area after their purchase of Lot 67A. This evidence supports the trial court's finding and we cannot agree with Wetherald's assertion regarding burden shifting.

### F. Finding Number 12 (Wetherald's use of the property is consistent with Strahl's).

■ In finding number 12, the trial court states, "[a]fter Wetherald's purchase of lot 66 from Strahl's [sic] in 1995, Wetherald and Jacksons continued the use of

the water and water's edge in the same manner as when Strahl's [sic] had been [the] owner. Wetherald used the water's edge up to the board jutting into the water attached to the retaining wall." Appellant's App. p. 8. First, Wetherald asserts that no evidence was presented as to Strahl's use of the water, and therefore, "it is impossible to reach a conclusion that Wetherald's use was the same." Br. of Appellant at 18. Wetherald also notes his own testimony that he excavated the area and installed a jet ski lift, used the water's edge and sand area to park his boats, allowed his relatives to play on the sand, and allowed his friends to fish the area. Finally, he states that the Jacksons cannot refute this evidence because they were only there one day a week and had no knowledge of any of Wetherald's activities when they were not present.

However, it is undisputed that when the Jacksons were present, Wetherald did not use the shoreline portion of the transfer area. In addition, the Jacksons' son, David, testified that Wetherald's excavation activities took place west of the transfer area. Tr. pp. 118–19. Moreover, given the trial court's judgment in favor of the Jacksons and Wetherald's lack of photographic evidence as compared to photographs establishing the Jacksons' use of the area, we agree with the Jacksons' contention that Wetherald's argument is simply a request for our court to reweigh the evidence.

G. *Finding Number 13 (Wetherald's lack of control over the transfer area)*

■ In finding number 13, the trial court states, "[a]fter Wetherald's purchase of lot 66 from Strahl's [sic] in 1995, Wetherald did not attempt to exercise control over the transfer area used and improved by Jacksons' [sic]." Appellant's App. p. 8.

Although, Wetherald correctly notes that both he and the Jacksons testified that everyone in the cove used the water of the transfer area for swimming and boating, this evidence does not establish control over the transfer area. Once again, Wetherald's argument is simply a request for our court to reweigh the evidence, which we will not do.

H. *Finding Number 14 (Wetherald's description of his property line to his guests)*

■ In finding number 14, the trial court states, "Wetherald told guests at his lot that when Jacksons were not present the guests could fish the shore-line as far as the (western) corner of the wood deck but no further to the east because past that point belonged to Jacksons. The wooden deck is west of the wooden dock and both of them are in the transfer area. Wetherald testified at trial that he told guests that they could fish to the end of Jacksons' wood dock, not deck. However, Wetherald's guests who testified at trial refuted Wetherald's assertion. The testimony from the guests show that Wetherald had notice of Jacksons' claim to the land in the transfer area." Appellant's App. pp. 8–9.

Wetherald testified that his property line started at the Jacksons' dock. Tr. p. 59. Wetherald later testified that he told his guests that the Jacksons' property line started at their deck. Tr. p. 219. Randy McCorkle, a guest of Wetherald, testified that Wetherald told him that the Jacksons' property line began at the Jacksons' gazebo. Tr. p. 162. McCorkle also testified that Wetherald allowed his grandchildren to play in the beach area. Tr. pp. 161–62. Wetherald never told McCorkle that the beach area belonged to the Jacksons. Tr. p. 162.

On the other hand, Thomas Carmer testified that Wetherald stated that his property line ran to the edge of the Jacksons' deck. Tr. p. 183. Carmer also stated that Wetherald told him to stay away from the beach area if the Jacksons were present. Tr. p. 190. Wetherald told Keith Olmstead that he could fish his property line, which extended to the edge of the Jacksons' deck. Tr. p. 172. Whether Wetherald told his guests that the Jacksons' property line started at their deck or dock, at least some section of each structure is in the transfer area, therefore, the trial court's last statement in finding number 14 is supported by the evidence.

I. *Finding Number 15 (Wetherald's lack of improvements in the transfer area)*

■ In finding number 15, the trial court states, "Wetherald has made many improvements to other parts of lot 66 including constructing [ ] a beach area used by his guests on the south water edge of lot 66 west from the transfer area. However, Wetherald had made no improvements to the transfer area since 1995 until construction of the portable ski jet dock in 2004." Appellant's App. p. 9. Concerning this finding, Wetherald notes his testimony that his neighbor constructed the beach area and seawall on the neighbor's property and extended it onto Wetherald's property. Tr. pp. 65, 68. Wetherald states that the evidence establishes that he made the following improvements to the area in addition to installation of the jet ski dock: dredging the area and removing the wooden board in 1999 or 2000.

All parties agree that Wetherald removed the wooden board, but it is questionable whether removal of the board constitutes an improvement to the area. There is conflicting testimony concerning whether or not Wetherald's excavation ac-

tivities occurred in the transfer area. The trial court found that they were not, and we will not reweigh that testimony on appeal. We agree with Wetherald's assertion that his neighbor constructed the beach area and extended it onto Wetherald's property with his permission. However, that portion of the finding is not dispositive of the issues presented in this appeal.

J. *Finding Number 16 (Taxes)*

■ In finding number 16, the trial court states, "Jacksons paid all taxes and assessments on lot 67A and reasonably believed, in good faith, that payment of all taxes on lot 67A included the transfer area and improvements in the transfer area. The taxes which they paid did include taxes paid on the wooden deck partially in the transfer area." Appellant's App. p. 9.

Wetherald contends that this finding is not supported by the evidence because the Jacksons received a survey of Lot 67A when they purchased it in 1988 and a replat of their lot in 1991, which establish that the transfer area is not included in their lot. The Jacksons consistently testified that they believed the boundary between their property and Wetherald's was established by the wooden board that jutted out of the water to the east of their sandy beach area. The 1988 survey does not show any of the docks or any other structure that might clearly establish the boundary between the two properties. Moreover, the 1991 replat does not show Wetherald's lot. The taxes that the Jacksons paid on Lot 67A included assessments for the Jacksons' deck, a section of which is located in the transfer area. Accordingly, we conclude that the trial court's finding that the Jacksons reasonably believed that they were paying taxes for the transfer area is supported by the evidence.

**K.** *Finding Number 17 (Jacksons' control over the transfer area)*

In finding number 17, the trial court states, "Since Jacksons' purchase of their lot in 1988 they have believed that the deed for their lot contained the transfer area. They exercised control over the transfer area intending to show their ownership by construction of improvements and use of the transfer area in such a nature to be open to the world." Appellant's App. p. 9. Wetherald argues that this finding is not supported by the evidence due to the Jacksons' review of the 1988 survey when they purchased the lot and the Jacksons' failure to establish that they controlled the entire transfer area, namely the portion of the transfer area that consists of the lake.

However, the Jacksons established control over the transfer area by their continuous use and numerous improvements to the area. Moreover, the evidence established that the Jacksons relied on Strahl's description of the boundary line between the two properties as a basis for their belief that the transfer area was part of their lot. Accordingly, we conclude that this finding is supported by the evidence.

**L.** *Finding Number 18 (The Jacksons' dock)*

In finding number 18, the trial court states, "[a]t the time of Jacksons' purchase of Lot 67A in 1988, a wooden dock was present in the east end of the transfer area. This was represented to the Jacksons to be contained within Lot 67A. Jacksons have rebuilt the wooden dock in its original location. It is customary for a property owner on a lake to have a dock on the water for their boat. Jacksons' use of the dock was exclusive to all others." Appellant's App. p. 9. Wetherald argues that the Jacksons never presented evidence that the dock "was represented to

the Jacksons to be contained within Lot 67A." He also contends that the Jacksons "did not present any evidence to the court regarding what is or is not customary for property owners on a lake." Br. of Appellant at 22.

Contrary to Wetherald's argument, Ronald and David Jackson testified that the dock was present on Lot 67A when the Jacksons purchased it. The Jacksons testified that they owned boats that they moored at their boat dock. Moreover, the Jacksons note that the trial judge viewed the area and is aware of the customary use of boat docks at lakes. This finding is therefore supported by the evidence.

**M.** *Finding Number 19 (Maintenance of the property east of the wooden board)*

In finding number 19, the trial court found that "Wetherald did not maintain the land east of the wooden board." Appellant's App. p. 10. Wetherald argues that this finding is not supported by the evidence due to his own testimony that he sprayed the shoreline for weeds and dredged the cove including a portion of the cove in the transfer area. Although the Jacksons concede that they cannot specifically refute Wetherald's testimony, they note their own testimony that they saw no evidence of Wetherald's claimed activities in the transfer area. Moreover, David Jackson testified that any excavating Wetherald had done was west of the wooden board boundary. Ex. Vol., Plaintiff's Ex. 4, pp. 10–11. We reiterate that we will not reweigh the evidence, as Wetherald is asking us to do. Accordingly, we conclude that the finding is supported by the evidence.

**N.** *Finding Number [20] (The Jacksons' uninterrupted use of the transfer area)*

In finding number [20], the trial court states, "[t]he Jacksons' use of the

transfer area has continued without permission from Wetherald or his predecessor in interest and without interruption since 1988." Appellant's App. p. 10. Wetherald contends that this finding ignores Wetherald's testimony that he knew the Jacksons were using his property, and therefore, by failing to object, he permitted their use of the transfer area. However, the trial court's finding is supported by evidence that the Jacksons used, maintained, and improved the transfer area and Wetherald never commented on their use.

### O. *Conclusions of Law Numbers 8 and 14*

The trial court issued the following conclusions of law, which Wetherald argues are not supported by clear and convincing evidence:

8. Based upon the characteristics of the transfer area, the normal and customary use of the transfer area would be during the summer months for swimming, boating and other recreational activities and for the placement of improvements for such use as boat docks, beaches, decks, jet ski docks and retaining walls. This is precisely what the Jacksons did from 1988 to the present.

14. Given the unique characteristics of private lake lot ownership and the use of the water next to the shore, control of the shore and the improvements in the water (such as a dock) that are in close proximity of the shore constitute evidence of control of the water near the shore. In this instance, the Jacksons have shown by clear and convincing evidence of their control, intent, and duration over the transfer area, including that area under the water.

Appellant's App. pp. 13–14.

Wetherald argues that these conclusions are not supported by the evidence because the Jacksons failed to present any evidence of the "customary use" for Grandview Lake and the "unique characteristics of private lake ownership and the use of water next to the shore." Br. of Appellant at 24. However, with regard to conclusion number 8, the trial court did not make any statement regarding the customary use for Grandview Lake. The trial court's conclusion focuses on the customary use for the transfer area. There was ample evidence presented by both parties as to how the transfer area was used. Concerning conclusion number 14, both parties presented evidence of the use of the water in the transfer area. Moreover, the evidence established the recreational use of Lots 66 and 67A, and we can reasonably infer that this was the evidence the trial court relied on in issuing conclusion number 14.

## II. Adverse Possession

In *Fraley v. Minger*, 829 N.E.2d 476 (Ind.2005), our supreme court clarified the elements necessary to prove a claim of adverse possession and stated:

the doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration, as follows:

(1) Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

(2) Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

(3) Notice—The claimant's actions with respect to the land must be sufficient to

give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements); and (4) Duration—the claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

*Id.* at 486.

 These elements must be established by "clear and convincing evidence." *Id.* at 483. The determination of whether such burden has been met falls within the sound discretion of the fact finder, whose discretion is afforded deferential review. *Id.* Moreover,

an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence.

*Id.* (quoting *In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind.2002)) (emphasis added).

### A. Control

 Wetherald contends that the evidence at trial established that the transfer area was used by the Jacksons and Wetherald and his guests, and the evidence presented merely establishes that "in the spirit of good neighbors, Wetherald allowed free access to the property in question for use by the Jacksons[.]" Br. of Appellant at 28. Furthermore, he asserts that our court has held that when an adverse possessor and land owner both claim to have used the disputed land during the statutory period, such conflict in the evi-

dence prevents a finding of exclusive possession. *Id.* (citing *Naderman v. Smith*, 512 N.E.2d 425, 431 (Ind.Ct.App.1987)). Wetherald's generalization of our court's holding in *Naderman* is inaccurate.

In *Naderman*, our court did not address the appellants' argument that they adversely possessed the gravel lane at issue because the appellants' interest in the lane was a permissive easement. *Id.* at 431 ("[A] permitted use cannot be adverse so as to ripen into fee simple ownership through adverse possession."). However, in a footnote, our court stated that the evidence was conflicting with regard to their claim of adverse and hostile possession. *Id.* at 431 n. 5. At trial, the Appellees and their predecessors in interest testified that they had used the lane for access to another parcel of land. Our court noted that "there was substantial evidence to support the court's conclusion number 2 that the Nadermans failed to show they had exclusive possession of the land for ten years." *Id.*

The facts of this case are more similar to those presented in *Snowball Corp. v. Pope*, 580 N.E.2d 733 (Ind.Ct.App.1991). In that case, the disputed section of land was mainly a swamp, which could occasionally be used as a garden during dry summers and a makeshift skating rink in the winter. Snowball Corp., the owner of the property argued that the adverse possessors, the Popes, did nothing to exclude the legal owners or others from the property, and therefore, failed to prove exclusive possession of the disputed property. *Id.* at 736. Specifically, the corporation noted that neighborhood children frequently ice skated on the swamp during the winter and pedestrians were allowed to walk across the property in route to a nearby restaurant. *Id.* Our court disagreed with the corporation's argument concluding that "[c]hildren ice skating and pedestrians tak-

ing shortcuts across the property are not, in our view, indications that the Popes intended to share ownership of their property with others[.]" *Id.*

Similarly, in this case, the fact that other individuals, including Wetherald, swam and boated in the transfer area does not negate the clear and convincing evidence the Jacksons presented which established their control of the area. The Jacksons built and maintained the following structures which are situated on the shoreline and in water sections of the transfer area: their dock, a jet ski dock, a section of their deck, a boat lift, a block retaining wall, and a sandy beach. Moreover, these uses are normal and customary considering the characteristics of lake property.

### B. *Intent*

 Wetherald contends that the Jacksons failed to establish intent to claim full ownership of the transfer area because the Jacksons conceded that other individuals swam and boated in the transfer area.[6] However, the Jacksons continually testified that they believed that they owned the transfer area. Ron Jackson also testified that if anyone had tried to construct a dock or some other structure in the area, he would have prevented him from doing so. This, of course, is exactly what occurred when Wetherald built his jet ski dock in 2004 and the Jacksons asked him to remove it. Furthermore, the Jacksons demonstrated intent to claim full ownership of the transfer area "superior to the rights of all others" by maintaining and/or constructing the sandy beach, the deck, docks, boat lift, and retaining wall. The fact that others swam and boated in the water of the transfer area is not at odds

with the Jacksons' intent to claim ownership of the area.

### C. *Notice*

 Wetherald contends that the Jacksons "took no steps to put Wetherald, or anyone else, on notice that they asserted an ownership interest in the property." Br. of Appellant at 30. However, Wetherald's argument is not supported by even his own testimony. Wetherald testified that he would use the beach area "sometimes [on] a weekend when the Jacksons' wasn't there[.]" Tr. p. 41. Wetherald's friend, Thomas Carmer, also stated that Wetherald told him to stay away from the beach area if the Jacksons were present. Tr. p. 190. Finally, the Jacksons' maintenance and construction of improvements in the transfer area were sufficient to give actual or constructive notice to Wetherald of their intent to control the transfer area.

### D. *Duration*

 The Jacksons were required to satisfy each of these elements continuously for ten years. *See* Ind.Code § 34–11–2–11 (1999 & Supp.2006); *Fraley*, 829 N.E.2d at 486. "Where one enters the land with the intention of asserting ownership and possesses the land openly and exclusively, exercising the usual acts of ownership upon the land for the full time under the statute of limitations, title will pass to the possessor." *Fraley*, 829 N.E.2d at 485–86.

 With regard to the duration element, Wetherald merely asserts that "[b]ecause [the] Jackson[s] failed to prove each and every individual element above, they must necessarily fail to prove the duration element." Br. of Appellant at 31. Given

---

**6.** We are unpersuaded by Wetherald's reliance on *Nodine v. McNerney*, 833 N.E.2d 57 (Ind.Ct.App.2005), *trans. denied,* in which lakefront property owners unsuccessfully claimed they adversely possessed portions of two streets that non-lakefront property owners used for access to the lake. *Id.* at 65–66.

our conclusion that the Jacksons proved the elements of control, intent, and notice by clear and convincing evidence, we need only observe that the Jacksons proved that they began to openly possess the transfer area in 1988. Therefore, title by adverse possession passed to the Jacksons in 1998, well before the property dispute arose in this case.

■ Finally, Wetherald argues that even if the Jacksons proved that they adversely possessed the section of the transfer area where the corner of their deck and the original wood dock are located, the Jacksons failed to prove that they adversely possessed the entire transfer area. *See* Br. of Appellant at 34–35 (citing *McCarty v. Sheets*, 423 N.E.2d 297, 300 (Ind.1981)) (The adverse possessor's claim "must be limited to that portion over which he exercises palpable and continuing acts of ownership[.]"). Specifically, Wetherald asserts the only improvements that have been in place for the requisite ten-year period are the corner of the deck and the original dock. However, the Jacksons presented evidence establishing that they have con-

trolled and used the entire transfer area for swimming, boating, and docking their boats. Therefore, the trial court's conclusion that the Jacksons controlled the entire transfer area for the requisite ten-year period is supported by the evidence.[7]

E. *The Adverse Possession Tax Statute*

■ In addition to the common law elements of adverse possession, the adverse possessor must pay the taxes that he or she reasonably believes in good faith to be due on the land during the period of adverse possession. Therefore, we must also consider whether the Jacksons established that they complied with Indiana Code section 32–21–7–1, the adverse possession tax statute.

In *Echterling v. Kalvaitis*, 235 Ind. 141, 126 N.E.2d 573 (Ind.1955), our supreme court held:

[W]here continuous, open, and notorious adverse possession of real estate has been established for twenty years to a contiguous and adjoining strip of land

---

7. The trial court issued the following conclusions of law with regard to this issue:

12. After conceding Jacksons' control and use of the original wooden dock as well as the corner of the wood deck in the transfer area, Wetherald argues that the Jacksons' have failed to show control over each of the other areas of the transfer area since they did not construct improvements in those areas for the requisite ten year period. The law does not require that persons making claims under adverse possession construct improvements on each square foot of the claimed area. Rather, they must "exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land." The Jacksons have in fact controlled all of the shore for over ten years by placing a sand beach, wooden dock, and wooden deck on parts of the shore throughout the entire transfer area on shore. They have exclusively maintained this area since 1988.

13. As it relates to the land under the water in the transfer area, the Jacksons have in fact controlled the area where the wooden dock and next to it for more than ten years. Next to the wooden dock, they parked their boat. In the transfer area to the west of the wooden dock, the water touched land where the Jacksons had their beach which they had maintained. While it is true that the Jacksons were not exclusively using the water which was in the transfer area, they maintained control of it because they maintained a dock and the land next to the water. Persons traveling in Grandview Lake may have driven their boats over the transfer area or swam in waters in the transfer area, but this does not negate the fact that the Jacksons maintained the improvements within the transfer area and the shoreline next to the transfer area.

Appellant's App. pp. 13–14.

such as that here in question, and where taxes have been paid according to the tax duplicate, although said duplicate did not expressly include that strip, adverse possession is established to that strip even though the taxes were not paid by the adverse claimant.

*Id.* at 146–47, 126 N.E.2d at 575.

Our supreme court examined the *Echterling* court's decision in *Fraley* stating,

Thus the Court essentially applied the statute to require the adverse claimant to substantially comply with the requirement for payment of taxes. Although the opinion did not expressly mention that the claimant's failure to pay taxes on the claimed boundary strip was inadvertent and unintentional, we believe that this is the clear implication.

829 N.E.2d at 490. Moreover, the court observed that the General Assembly made no operative changes to the statute after *Echterling* was decided, and therefore, the court took a restrained view of the legislative acquiescence in the *Echterling* court's interpretation of the statute. *Id.* at 493. Therefore, the *Fraley* court held:

*Echterling* permits substantial compliance to satisfy the requirement of the adverse possession tax statute in boundary disputes where the adverse claimant has a reasonable and good faith belief that the claimant is paying the taxes during the period of adverse possession. But we decline to extend *Echterling* to permit total disregard of the statutory tax payment requirement merely on grounds that the legal title holder has other clear notice of adverse possession.

*Id.*

The General Assembly approved this holding by amending Indiana Code section 32–21–7–1 and adding the following emphasized language to the statute:

In any suit to establish title to land or real estate, possession of the land or real estate is not adverse to the owner in a manner as to establish title or rights in and to the land or real estate unless the adverse possessor or claimant pays and discharges all taxes and special assessments *that the adverse possessor or claimant reasonably believes in good faith to be* due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely. However, this section does not relieve any adverse possessor or claimant from proving all the elements of title by adverse possession required by law.

Ind.Code § 32–21–7–1 (Supp.2006) (emphasis added).

In this case, the trial court concluded that the Jacksons reasonably believed in good faith that payment of taxes on Lot 67A included the transfer area "and thus paid all taxes and special assessments on the transfer area." Appellant's App. p. 13. Therefore, the Jacksons substantially complied with the tax statute requirement for adverse possession.

Wetherald asserts that the Jacksons could not have reasonably believed that they were paying taxes on the transfer area. In support of this argument, Wetherald relies on the 1988 survey and the replat of the Jacksons' lot in 1991. However, the 1988 survey does not show any of the docks or any other structure that might clearly establish the boundary between the two properties. Moreover, the 1991 replat does not show Wetherald's lot.

The Jacksons consistently testified that they believed that the transfer area was included in their lot. In addition, the taxes that the Jacksons paid on Lot 67A included assessments for the Jacksons' deck, a section of which is located in the transfer area. Consequently, when the

Jacksons paid their taxes they reasonably believed in good faith that they were paying taxes for the transfer area as well. Therefore, there is clear and convincing evidence from which a reasonable trier of fact could conclude that the Jacksons complied with Indiana Code section 32–21–7–1.

## Conclusion

Wetherald has not established any reversible error concerning his challenge to the trial court's findings of fact and conclusions of law. The Jacksons established by clear and convincing evidence that they adversely possessed the transfer area and that they reasonably believed in good faith that they were paying taxes on that area. Therefore, the trial court's judgment is affirmed.

Affirmed.

BAKER, J., and BARNES, J., concur.

# APPENDIX